UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20026-CR-MOORE/TORRES

UNITED STATES OF AMERICA

v.

FAUSTO AGUERO ALVARADO,

                Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America submits this Sentencing Memorandum in anticipation of the October 10, 2013 sentencing hearing in the above-styled matter. The advisory sentencing guideline range in this case is a term of incarceration of 292-365 months. The United States of America recommends a term of incarceration of 328 months.

    **I.    FACTS**

On January 7, 2011, Fausto Aguero Alvarado (hereinafter "Mr. Aguero,") was indicted along with five other individuals by a federal grand jury in Miami. The original indictment charged Mr. Aguero with conspiracy to provide material support to a foreign terrorist organization (Count One) and with conspiracy to distribute five (5) or more kilograms of cocaine knowing that the cocaine would be unlawfully imported into the United States (Count Five). Indictment (DE #1).

Mr. Aguero had been captured in Colombia by Colombian law enforcement authorities on November 12, 2010, approximately six weeks prior to the filing of the indictment. Mr. Aguero was charged in Colombia with conspiracy and with possession of a false identification document. Mr. Aguero ultimately pled guilty to those charges.

Following the filing of the indictment in January 2011, the United States sought to extradite all six defendants charged. The Colombian government ultimately agreed to the extradition of three of the six defendants: Mr. Aguero, Franklin William McField-Bent, and Jeison Archbold. The Colombian government allowed the extradition of Mr. McField-Bent on all charges; however, the Colombian government allowed the extradition of both Mr. Aguero and Mr. Archbold on the express condition that each could only be prosecuted on one of the charges in the indictment. As a consequence, the Government could only proceed against Mr. Aguero on Count Five – the drug conspiracy charge.

Mr. McField-Bent was the first to be extradited, ultimately pled guilty, and was sentenced to a 235-month term of incarceration, a sentence at the high end of the advisory guidelines. Mr. Archbold also pled guilty and was sentenced to a 135-month term of incarceration, a sentence at the low end of the advisory guidelines. Mr. Aguero decided not to plead guilty. The Government filed a Superseding Indictment against Mr. Aguero charging him with the drug conspiracy charge. Mr. Aguero was convicted on July 22, 2013 after a six-day jury trial in this Court.

The evidence at trial showed that from June 2009 until May 2010, Mr. Aguero participated in at least three in-person meetings and several telephone calls with a Homeland Security Investigations ("HSI") source posing as a commander of the Autodefensas de Colombia, a Colombian paramilitary group designed by the United States Department of State as a foreign terrorist organization. The evidence also showed that, during the same timeframe, Mr. Aguero participated in several telephone calls with his alleged co-conspirators, Mr. McField-Bent and Mr. Archbold. During these calls and meetings, Mr. Aguero agreed with Mr. McField-Bent, Mr. Archbold and another indicted conspirator, Miguel Villela-Meza, to obtain

hundreds of kilograms of cocaine in Colombia and have other conspirators ship the cocaine to Mr. McField-Bent in Honduras. From there, Mr. McField-Bent would distribute the cocaine to individuals who would eventually take the cocaine north to Mexico and, eventually, the United States.

The HSI investigation which ultimately led to Mr. Aguero's extradition targeted individuals who sought to provide dangerous weapons, such as rocket-propelled grenade launchers, automatic rifles and surface-to-air missiles, to terrorist organizations. On June 15, 2009, during his first meeting with the HSI source posing as the terrorist commander, Mr. Aguero suggested that while he could arrange to sell weapons for the "commander," he would prefer to broker an "exchange" of the weapons for cocaine. During this first meeting, Mr. Aguero explained that he currently was working on a 1,000-1,500 kilogram cocaine deal with a Colombian woman (hereinafter identified as "L.E.G.") and subsequent intercepted telephone calls showed that Mr. Aguero was working with Mr. McField-Bent and Mr. Archbold to obtain "L.E.G.'s" cocaine and ship it to Mr. McField-Bent in Honduras.

Mr. Aguero arranged for a second meeting with the HSI source, Mr. Archbold, and other traffickers on July 25-26, 2009. At the end of this meeting, the HSI source provided several thousands of U.S. dollars to one of the traffickers whom Mr. Aguero had brought as a down payment for weapons. Throughout this meeting, Mr. Aguero and Mr. Archbold both complained about the fact that the cocaine deal with "L.E.G." had fallen through even though Mr. Aguero had arranged for Mr. McField-Bent to pay "L.E.G." $12,000 as a down payment for the cocaine. The evidence at trial showed that Mr. Aguero, believing that the HSI source was a dangerous individual, asked the source to pay a visit to "L.E.G." in an effort to collect money from her. To that end, Mr. Aguero sent the source an e-mail with "L.E.G.'s" photograph and

address.  On cross-examination, Mr. Aguero conceded that he believed that there was a good possibility that his actions could have placed "L.E.G." in danger.

The individuals whom Mr. Aguero brought to the July meeting failed to supply the HSI source with weapons.  In response, Mr. Aguero agreed to have the source meet directly with Mr. McField-Bent.  Mr. McField-Bent and Mr. Archbold met with the source in Colombia on December 7, 2009, and continued to negotiate the parameters of a potential cocaine-for-weapons swap.  In the ensuing months, the conspirators also attempted to send approximately 440 kilograms of cocaine to Honduras and visited a cocaine production farm in the Colombian interior in an effort to identify another potential source of supply.  On May 9, 2010, Mr. Aguero, Mr. McField-Bent, Mr. Archbold, and Mr. Villela-Meza met with the HSI source as part of a set of meetings to finalize negotiations for the cocaine-for-weapons swap.  Mr. McField-Bent and Mr. Archbold were the primary negotiators, and agreed to receive 400 kilograms of cocaine from the source every 20 days and send the cocaine to Honduras.  Instead of paying the source $7,000 per kilogram, Mr. McField-Bent and Mr. Archbold agreed to purchase weapons for the source and arrange to deliver the weapons to the source in Colombia. This deal was, in essence, the same "exchange" that Mr. Aguero had originally proposed to the source at the very first meeting between Mr. Aguero and the source.  At some point, Mr. Aguero and Mr. Villela-Meza joined the meeting in progress and all agreed to work together to accomplish the goal of sending the source's "cocaine" from Colombia to Mr. McField-Bent in Honduras.

At trial, Mr. Aguero took the stand and claimed that he honestly believed that he was engaging in the meetings, telephone calls and wire transfers in an effort to help the Drug Enforcement Administration.  He testified that he had been a DEA confidential source, and had

in the past provided his controlling agents with detailed reports of his meetings with targets. He conceded that he had not told any DEA agents about the meetings, telephone calls and wire transfers at issue in this case (much less received authorization from the DEA agents to participate in the meetings, calls and wire transfers), and that he had not done so because he was not "putting a case together" but merely "investigating." He made numerous false statements while testifying, some of which are detailed in paragraph 22 of the Presentence Investigation Report ("PSR") (DE 212). The jury ultimately convicted Mr. Aguero of conspiring to distribute 5 or more kilograms of cocaine knowing that the cocaine would be unlawfully imported into the United States.

Because the conspiracy involved over 150 kilograms of cocaine, Mr. Aguero's base offense level was Level 38. PSR, ¶ 25 (DE 212). Because of Mr. Aguero's false testimony, Mr. Aguero's base offense level was upwardly adjusted by two levels to Level 40. PSR, ¶ 29 (DE 212). The original PSR also recommended another two-level upward adjustment for violence (based on Mr. Aguero's request to have the "terrorist" collect money from "L.E.G.") but this recommendation was subsequently withdrawn by the probation office because the enhancement initially appeared in the version of Sentencing Guidelines published after Mr. Aguero had completed the charged offense. Mr. Aguero has a Criminal History category of I, thus his advisory sentencing guideline range is 292 to 365 months.

II.     ANALYSIS OF 18 U.S.C. § 3553 FACTORS

18 U.S.C. § 3553 provides a list of seven factors which courts must consider in imposing a sentence "sufficient, but not greater than necessary" to comply with the general principles of general and specific deterrence, to provide necessary training or medical treatment, and the need to "reflect the seriousness of the offense, to promote respect for the law, and to provide just

5

punishment…" 18 U.S.C. § 3553.  The statute requires the court to consider: 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the need for the sentence imposed to comply with the purposes listed above; 3) the kind of sentences available; 4) the advisory sentencing guideline range in the United States Sentencing Guidelines; 5) any pertinent policy statement issued by the United States Sentencing Commission; 6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and 7) the need to provide restitution.

While Mr. Aguero's offense of conviction was participation in a drug-trafficking conspiracy, the facts adduced at trial demonstrate that Mr. Aguero had also conspired to provide extremely dangerous weapons to a person whom he believed was a paramliltary commander. The Government acknowledges that the conspirators were arrested before they could consummate the agreed-upon drugs-for-weapons deal, but the facts at trial demonstrated that one individual, Juan Carlos Cuao Camacho, did sell the HSI source several grenade launchers, grenades, an Uzi submachine gun and ammunition.  Mr. Cuao Camacho had been introduced to the source by Mr. McField-Bent (who in turn had been introduced to the source by Mr. Aguero). Once the HSI source purchased the weapons, he called Mr. Aguero to let Mr. Aguero know that he had done business with Mr. Cuao Camacho and to ask Mr. Aguero to thank Mr. McField-Bent for the introduction.  While Mr. Aguero's role in the weapons transaction was admittedly minimal, the HSI source would not have been able to purchase the grenade launchers and the Uzi from Mr. Cuao Camacho without Mr. Aguero's initial introduction to the man who in turn introduced Mr. Cuao Camacho, Mr. McField-Bent.

The Court should also consider the episode involving "L.E.G." when analyzing the nature and circumstances of the offense.  Mr. Aguero asked the HSI source – a man he believed to be

dangerous -- to collect a debt from "L.E.G.," all the while believing that there was a good possibility that "L.E.G." could be seriously harmed in the process. Mr. Aguero could not argue that he was just simply talking about the possibility of having the source pay a visit to "L.E.G;" Mr. Aguero followed up his request of the source with an e-mail containing "L.E.G.'s" photograph and address. Mr. Aguero fully expected that the source would confront "L.E.G.;" indeed, Mr. Aguero testified at trial that he began to have doubts about whether the source was in fact a paramilitary commander when the source failed to confront "L.E.G." as he had said he would. While "L.E.G." was never in any serious danger, the callous regard for her welfare displayed by Mr. Aguero militates for a sentence in the mid-range of the guidelines.

Mr. Aguero testified at trial that he had provided significant information to the United States government in the past. The Government anticipates that Mr. Aguero will argue at sentencing that the Court should take these good deeds into consideration when considering Mr. Aguero's history and characteristics. The Government acknowledges that Mr. Aguero did provide information as a DEA confidential source prior to his conduct in this case. However, after he was deactivated as a DEA source, Mr. Aguero then used the skills he learned as a confidential source in his effort to frustrate law enforcement efforts to stop drug trafficking activities. The jury heard significant evidence throughout the trial that Mr. Aguero counseled co-conspirators to avoid discussing certain topics related to drug trafficking activities over the telephone out of concern that the calls were being intercepted by law enforcement. There was also evidence that Mr. Aguero suggested to the HSI source that the source switch to a different cellular telephone provider because it was harder for law enforcement to listen in on calls handled by that provider. And then, just days after many of his co-conspirators had been arrested, Mr. Aguero slyly began to set up his intended public authority defense by referencing

the capture of the co-conspirators in an e-mail to his former handling agents and asking for DEA's protection from them.   In conclusion, Mr. Aguero's prior service as a DEA confidential informant does not support an argument for a lower sentence; to the contrary, it supports an argument for a higher one.

 As for the remaining § 3553(a) factors, the Government believes that a sentence in the middle of the advisory guideline range is necessary to reflect the seriousness of Mr. Aguero's offense and to afford adequate deterrence to criminal conduct by other informants who may otherwise choose to follow Mr. Aguero's path to perfidy. Confidential sources are frequently the tip of the spear of the United States' efforts to curb the illicit drug trade.  Most toil while exposed to the constant temptation of making easy money by supporting the very individuals they are supposed to be helping to catch.   A sentence within the advisory guideline range is essential to provide a disincentive to other informants to use their skills in the pursuit of illegal activity.

 Mr. Aguero took the skills that he learned as a DEA confidential informant and put them to use during his participation in the cocaine distribution conspiracy.   In his zeal to accomplish his goal, he began negotiations to acquire the drugs from a man he believed to be a dangerous paramilitary commander and to exchange the drugs for high-powered weapons.   Mr. Aguero then asked that man to collect a debt from another individual from whom he had attempted to acquire cocaine, believing that there was a good possibility that serious harm could befall the individual in the effort to collect the debt.   At trial, Mr. Aguero not only refused to accept responsibility for his conduct, but claimed that he believed that he was engaging in several months' worth of calls, face-to-face meetings, and wire transfers in an effort to "investigate" on behalf of the DEA.   When confronted with the fact that he had not notified any of his handling

agents about any of the myriad calls, face-to-face meetings, and wire transfers, he proffered an incredible story about how he had been told that all of his calls and meetings were been monitored in real-time using advanced voice-recognition and computer virus software and that he had recorded all of the multiple-hour-long meetings on his I-Phone but hadn't gotten around to providing the agents with the recordings in several months. His explanation required the jury to believe that several law enforcement witnesses (including a DEA agent, a Colombian prosecutor, and a Colombian law enforcement officer) had lied on the stand. Mr. Aguero's version of events was not credible, and the jury ultimately convicted him of the one charge in the superseding indictment.

### III. CONCLUSION

An analysis of the 18 U.S.C. § 3553(a) factors militates for a sentence within the advisory sentencing range of 292-365 months. Specifically, the United States believes that a sentence in the middle of the applicable sentencing guideline range – a sentence consisting of a 328-month term of incarceration – is the appropriate sentence in this case.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     /s Adam S. Fels
        ADAM S. FELS
        Assistant United States Attorney
        Court Identification No. A5501040
        99 Northeast 4th Street
        Miami, Florida 33132-2111
        (305) 961-9325
        (305) 536-7213 (fax)
        Adam.Fels@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 8, 2013, I caused the foregoing document to be filed with the Clerk of the Court via the CM/ECF system.

s/ Adam S. Fels
ADAM S. FELS
ASSISTANT UNITED STATES ATTORNEY